We will be pleased to hear from Mr. Scherr. May it please the Court, good afternoon. My name is Todd Scherr and with Scott Gavin. We're from CCRC South in Fort Lauderdale and we represent the petitioner Anton Krawczuk in this habeas appeal. There's one issue that's involved in this case based on the COA that was granted by the Court and that's the ineffective assistance of counsel of the penalty phase claim. And what I'd like to emphasize at the beginning is that this is really a quintessential failure to investigate and prejudice resulting therefrom as opposed to what's really sort of characterized this case thus far as a waiver of mitigation case. And I classify it as a failure to investigate case for a number of reasons. Obviously, under Strickland, Mr. Krawczuk is obligated to establish two prongs, deficient performance and prejudice. And under AEDPA, we're also required to demonstrate that the Florida Supreme Court's decision is either contrary to or an unreasonable application of Strickland. And I believe we have met all those burdens in this case. I'd first like to address deficient performance, which under the unique circumstances of this case, kind of overlaps into the prejudice. But what I think one of the major issues that's been lost, certainly was lost on the Florida Supreme Court, is the chronology of events that took place in Mr. Krawczuk's case, which make his case different and certainly unique and distinguishes it from other cases where there have been similar, although certainly not equal, facts with respect to quote-unquote waivers and mitigation. What we have in this case, Mr. Krawczuk pled guilty. And his counsel actually was appointed in October of 1990. And Barbara Legrand was the attorney who was appointed to represent Mr. Krawczuk. And at the outset, Ms. Legrand filed a series of what we call pro se or not pro se, pro forma death penalty motions. And really from the beginning of that representation, for the next almost nine months, there was really consistent effort by Mr. Krawczuk to cooperate with Ms. Legrand. Ms. Legrand, for example, earlier on in the representation, talked to Mr. Krawczuk about his background, about his family history, about his psychiatric history and psychiatric background. Mr. Krawczuk was cooperative with her. There's no suggestion in the record otherwise. One of the things that Ms. Legrand asked Mr. Krawczuk to do, because Mr. Krawczuk had been in the military, was to sign a release authorizing the military to provide Mr. Krawczuk's psychiatric records to her, which he did. Those records were provided. The release actually was signed on February 27, 1991. And I get into the dates, and I hope I did it persuasively in the brief, because I think the dates, again, and the chronology are very important here. Am I correct that she had done 17 capital cases before this one? I believe that was her testimony. So she was an experienced capital attorney. Is that correct? Yes, she had that experience. Correct. You characterize everything as pro forma. Well, I'm saying pro forma in terms of a series of standard death penalty motions, motions attacking the constitution of the death penalty. I don't mean pro forma in the sense of thoughtless, but pro forma in the sense that they're- Did she file the correct motions? She did file a number of motions, correct, including one for the appointment of a mitigation specialist, which was never followed up on, which is a point that we'll get into a little bit later. But, again, Ms. Legrand did receive the records from the military, which pointed to a number of red flags about the need for further investigation, certainly into Mr. Krawchuk's history, not only his psychological, psychiatric history, but also his family history. Those medical records from the military, and they were from 1980, included references, for example, to expressions of suicide, apathy, disinterested attitude, discusses Mr. Krawchuk's recitation of his family history. The report refers to a, quote, unquote, broken home, that he has a mixed personality disorder, and it recommended and offered psychotherapy as well as additional counseling. Once those records were received, Ms. Legrand forwarded them to Mr. Krawchuk, but in a letter dated March 3rd indicated that, based on her review, she didn't see any need for any further psychiatric evaluation. Now, the next step in this chronology, I think, is one of the more critical points here that was certainly overlooked in all of the courts that have evaluated this claim, and it's Mr. Krawchuk's letter to Ms. Legrand on March 5th, 1991. By the way, all these letters are in the record. Mr. Krawchuk's letter first discussed the fact that he wanted no deals with the state. He was very interested in pursuing his case to trial. He wanted to be judged by a jury of his peers. He indicated that he doubted a death sentence would be likely, given the facts of his case. And in the most important part of this letter, he acknowledges that he is in a serious situation, and he indicated, quote, I still want Dr. Keown, who was the doctor that Ms. Legrand had asked to be appointed for purposes of evaluating Mr. Krawchuk's sanity and the time of defense and his competence to stand trial. And Mr. Krawchuk insisted that he be afforded the opportunity to be examined by Dr. Keown, Kehoe, because that was part of the defense strategy in this case. Following that, Ms. Legrand wrote back to Mr. Krawchuk, indicating that in her view the medical records didn't give her any basis at that point to ask for further evaluations, but that she would send Dr. Keown in to conduct an evaluation, and that based on what he determined, she would then determine if any follow-ups were needed. That letter, and then we're talking about March 8th now. Now we're several months before the guilty plea here. That letter also included reference to the Florida's aggravation factors and mitigation factors, and briefly attached actually a copy of the statute for Mr. Krawchuk to review. In April, the doctor evaluated Mr. Krawchuk. In fact, she listed the mitigating factors she wanted to try to prove at trial. She listed them, correct. She said that she intended to prove on his behalf. Those were the proposed ones, correct. Yeah, so she's proposing at that time, let's go forward with trying to prove some mitigation. That's correct. Now in terms of the chronology, that's obviously correct. That's what her letter says. When you overlay her testimony about what she was actually doing at the time, while she certainly proposed all of that, she had done nothing aside from getting the psychiatric records. She was still awaiting at that point the results of the doctor's competency and sanity evaluation, but she had spoken to no one in Mr. Krawchuk's family save for two six-minute conversations with, I believe, his mother and his grandmother. That was it. Family was all local. Nobody ever contacted them. And this is, of course, at a time again when Mr. Krawchuk is being fully cooperative, signing releases, meeting with the doctor, fully open with the doctor about his background, his history, certainly his quote-unquote broken home, things of that nature. Everything is fine. There's nothing in the record at this point in letters or otherwise to suggest that there's any issue about either waiving mitigation or certainly curtailing Ms. Legrand's investigation at this time. And again, now we're in April. We're six months into her representation. At the end of April, Mr. Krawchuk writes to the judge and asks— Wait a minute. Dr. Cowan gives his report on April 9th. Correct. And that report has a lot of information about his family and his psychiatric condition. That's correct. So she was at that point—yes, and that's all— She basically had the doctor interview him, and he did, and it refers to all of his horrific family childhood issues. It refers to his childhood issues. It does not, as the circuit court later found in post-conviction, the quality and quantity of the evidence presented at the 3851 hearing far exceeded what was provided to Dr. Kiel. But certainly, yes, that was provided, and that demonstrates Mr. Krawchuk's cooperation not only with the doctor but also with his counsel. He told the doctor his mother was physically and verbally abusive, that his stepfather beat him. All of this was in the psychiatric report. Correct. That was self-report by Mr. Krawchuk. He had no meaningful relationship with the father and that his poor family-like wife drove him to truancy and criminal activity. Correct. He tells the doctor that. That's all information that Mr. Krawchuk provided to the doctor. What was later presented at the hearing, sort of jumping ahead here, was obviously a lot more detail in terms of from other family members who not only— for example, his brother, who not only was the recipient of some of this abuse but certainly witnessed it. For example, you know, when Mr. Krawchuk was a child, he would soil his pants, and his mother made him walk around outside with a sign saying, I do duty in my pants every day. We understand there was more evidence of the 3.85 than typically is. As years later, 15 witnesses testified there was more evidence of some of these same things. There wasn't anything entirely new, though. Well, yes, there was. The family background was expanded on, and at the evidentiary hearing there was mental health testimony that was never presented or investigated by Ms. LeGrand. Because you have to remember, the doctor that was appointed was not examining this case for purposes of mitigation. He was evaluating for sanity and competence, which under this court's precedent are two different things. So again, we— Maybe, if I can just bring this to a head. Yes. As you know, the Florida Supreme Court said that, you know, all of the information that could have come from the family was available through Dr. Cowan's report. Maybe what you're trying to tell us is what was wrong with that? How is that an unreasonable finding of fact by the Florida Supreme Court? Well, again, not all of the information was available in that report about the specifics about Dr. Cowan's report. And one of the more critical aspects is that that information—because normally, obviously, what happens in these cases is that an expert evaluates the defendant, and then the state comes up and says, well, you didn't corroborate this with any other sources. It's just a self-report of the defendant. It's self-serving. So what we have here is obviously corroboration not only of those facts, but far more expansive and far more detailed and far more horrific examples of the physical, emotional, and verbal abuse that Mr. Krawchuk underwent, in addition to the fact that the doctor, like I said, did not evaluate Mr. Krawchuk for mitigation purposes. And so unlike what was presented at the evidentiary hearing, there was nothing in his report to indicate the existence of, for example, either of the two mental health statutory mitigating factors, which both Dr. Crown and Dr. Sultan did later testify to. The main issue that we have with the Florida Supreme Court's findings are its determinations that there were these repeated instructions by Mr. Krawchuk to not have his family involved and to not investigate. I didn't see those anywhere. And even the circuit court, after hearing this, indicated that the record does not establish this unequivocal instruction. And so certainly in that respect, we submit that the Florida Supreme Court decided, did it not, that even if all of this had been uncovered, there's no prejudice because Mr. Krawchuk would not have let his counsel introduce mitigating factors. Isn't that right? The basis of their – that's correct. They didn't address deficient performance. They only addressed prejudice. And to that – And that's their prejudice determination, right? Their prejudice determination was because of Krawchuk's instructions to counsel not to involve his family, we find that Krawchuk cannot establish prejudice. And there's a number – I don't think it's about not to investigate. It's about that he wouldn't have allowed it to be presented. That's correct. That's what the Florida Supreme Court is saying. That's correct. My question about it is, is that a determination of fact or is that a determination of law? I think it's a – well, certainly prejudice is a mixed question of fact and law. It's a determination that he – that your client, Mr. Krawchuk, would not have allowed that to occur. It's a determination about something that's hypothetical, right, that would not have happened. Is that fact, law? How do we review that? I mean, for a number of reasons, as I indicated in the brief, we submit that the prejudice analysis should be reviewed de novo, irrespective – and I don't mean to dodge that question, but there are other reasons also to look at the prejudice prong de novo. One is that as it's clear from their holding, the Florida Supreme Court's prejudice analysis focuses only on the family member mitigation. It mentions nothing about the mental health mitigation, and it mentions nothing about the mitigation regarding the relative culpability of Mr. Krawchuk and the co-defendant. And so to the extent that the Florida Supreme Court failed to engage with all of the – The court, though, said there was significant mitigation available that was not uncovered by counsel. I mean, the fact that they discuss the family stuff does not mean that they didn't review at all. They don't say anything about it. And that line, what you just indicated, Your Honor, right after that it says, it is equally clear that Krawchuk repeatedly insisted that counsel not pursue mitigation and not involve his family. So it's very clear that they are focused solely on the family mitigation, which is an unreasonable application of prejudice prong. How can that be when they say there's a substantial amount of evidence that they didn't uncover, and he's saying don't pursue it? I mean, he's saying don't present it. You don't read pursue as present? When you read the context of that last paragraph, what they're talking about is what I was indicating earlier, which is that the breadth of the family history mitigation far exceeded that which was provided before, that Ms. Legrand knew about. Let's go to what the district court did. Yes. And let's just focus on that. And as I understood the district court order, the district court put aside deficient performance, didn't go there. The district court also said we will assume counsel would have uncovered all this evidence in a reasonable investigation. But the district court found, I don't know if this is a fact finding or a conclusion. I think it's probably a mixed question. But the district court said your client did not put forth any evidence, an affidavit, testimony, deposition, any evidence saying if I had known all of that, I would have allowed my counsel to present it. And so that was the narrow holding of the district court. Is that correct? There was no evidence. I'm not talking about allegations. There was no evidence where he, Mr. Krawcheck, came in and said if I had known all that, I would have allowed Ms. Legrand to have presented it. Is that correct? What you're saying is correct. And the reason why there was no such evidence or affidavit or declaration is because it's not required. It's not a requirement under Strickland. And to put that gloss on the prejudice analysis. I have a reason for it. That may be a reason why at the end of the day it wouldn't be dispositive. But it's not a reason why it didn't happen. I don't. I'm sorry. There's nothing to have prevented that from, that evidence from having been presented. With due respect, I think that's, I don't think that's the point. I think the point is we've met what our proof is under Strickland prejudice, which is establish a reason and probability of a different outcome. And under all of these cases that have looked at this scenario. But you concede there is no evidence, as the district court said, whether you have to put in evidence or not. We'll talk about that in a minute. But there is no evidence where your client in an affidavit deposition or anywhere said, I would have allowed my client to present that. There's no such affidavit or testimony. I know you say there was no requirement. Right. But what I would ask the court to look at is the very equivocal colloquies that occurred at the penalty phase. Because that really is the time when all of this came to a head. And what's very clear is that even the state was confused about what Mr. Krawchuk may have been waiving, what he wasn't waiving, what was going on. Even his counsel indicated some confusion about that. Mr. Krawchuk was going back and forth. And what I would like to stress in the limited time that I have are a number of points about that. One. Are we to make an inference from what you just described that he would have allowed it or just a reasonable probability? It's a reasonable probability. And then what do we do with the fact that he forever said, I don't want you presenting it? Not once. Twice. Three different judicial proceedings. In letters. How have you shown a reasonable probability? I think you have to have him. I'm just speaking for myself. All he's got to do is fill out an affidavit in the 3.850. He doesn't have to testify. He can just say, I would have allowed you to get into that. Even though I didn't at trial and even though I swore an oath to the court, I don't want my lawyer to do it. I didn't know all that. I would have let you. Okay. But let's say you don't have to have that. I'm not sure I agree. But let's say you don't. What do you do with the evidence? He's repeatedly saying, I don't want you to present it. And you say, well, look at ABC. How does that counter that? Even begin to establish a reasonable probability? Because what – and that's why I started off with the chronology and that's why I think it's so important. Because this is not like a case. I want to promise you we got the chronology when we prepare these cases. No, I understand it. But I'm saying that's why I think – but I think the lower court and the Floor Service Court didn't look at the chronology. Because if you look at – when you look at the chronology, it's very clear that only until after he pled guilty did Mr. Krawchuk express reservations about mitigation. Up until that point, and this is the point I'm trying to stress, is that Ms. LeGrand had almost a year to take advantage of a very cooperative client to get the mitigation investigated. If he's found guilty, then even for the sentencing judge, again, he won't let her present it. Okay? He equivocates about that. Well, I may want to let you do the doctor's report to assume – to keep it from being ineffective assistance. He's very smart, obviously. He does equivocate, and that's the point. No, but he comes out and says, but I don't want you to present anything. I mean, he's fully advised. But then the judge says to Ms. LeGrand, let's say I tell you to present it. She says, I don't have anything. I didn't do anything. So, is this a legal determination we make, or is it a fact finding of reasonable probability he would have allowed his client? I think that's a – I mean, it's prejudice. That's what prejudice analysis is, is a legal question. That final, ultimate decision of prejudice is a mixed question, though, in fact. This is an underpinning of your prejudice claim. So, a reasonable probability that if this had been discovered, he would have presented it. Do you contend that's a fact finding or a legal issue? I disagree with the way you presented the question. Well, sir, guess what? You don't get to ask the question. I understand, but under Strickland, it's a reasonable probability of a different outcome, not a reasonable probability that he would have changed his mind. All right, and so is that determination of reasonable probability he would have changed his mind, is that a legal question or a factual question? Assuming that's the correct analysis, I think it's like any other prejudice analysis. It's a legal question. All right, so that's just a legal question. Right. And then we look to what the evidence is in the case to inform the legal question. Is that what we do? Correct, just like any other prejudice analysis. And so how on this record, okay, when he has throughout primarily said consistently, and at three different judicial hearings, I don't want you to present it, and he still doesn't contradict any of that, how could you possibly make a legal determination that there was a reasonable probability with that state of the record? I respectfully disagree with the way you've characterized the record. As I said out in the brief, there's not this consistent, I don't want you to present mitigation. And I think that's part of the issue that we have with the way that the Floristroom Court looked at this, is when you look at this tremendous amount of time that the attorney had to deal with mitigation, number one, and he pleads guilty in, I believe it's August. Did you represent him in the 3.850? No, I did not. Okay, who did represent him? Other attorneys in my office. In your office? Yes. Your office represented him? Yes. Okay. I see I'm way over my time, so with respect, I would ask that the court reverse. You preserved your time in rebuttal. That will be fine. Thank you. Uh-huh. Will the Secretary, Mr. Achey, or Mr. Ack? It's Ache, Your Honor. Either one. Steven Ache, Assistant Attorney General on behalf of the respondent. Thank you. Like A-C-H-E. You know, they pronounce it, I've heard it pronounced numerous different ways, Your Honor, so my family does Ache. My opposing counsel spent quite a bit of time talking about deficient performance, which I don't really think is this court's inquiry to really delve into. You agree that the Florida Supreme Court did not decide on performance, I gather, from your brief. Is that right? Correct. It was a strictly prejudice analysis, and in fact, the Florida Supreme Court and the District Court both did it on the prejudice analysis only. I think that is the issue that we're really, this court's going to have to decide, and I think this court's precedent in a number of cases, which I cited in my brief. Pope, Cummings, Allen, Gilreath, all those cases follow the U.S. Supreme Court's lead in the Shiro v. Landrigan case, where when you have a defendant that's basically telling the court and his counsel, I don't want to present any mitigation to the jury, he can't establish prejudice unless he comes back and says something to the effect of, if I would have known this, I would have changed my mind and allowed my counsel to do it. And we don't have that in this case. We have no evidence whatsoever in this case that Mr. Kropchak would have allowed his attorney to present anything. And in fact, I think the record is clear, and the factual determination made by the Florida Supreme Court is very well supported by the record in this case. You know, I don't think that's right. I mean, it seems to me that the Florida Supreme Court says over and over and over again he instructed his counsel not to involve his family. And I've read every time he talked to the judge, and I don't see that anywhere. Your Honor, I agree with you as to the respect with the family portion of it. My portion of what I'm saying is the waiver of mitigation, that he did that on three separate occasions. Now, Your Honor, you're correct about the family thing. The family thing only came up upon questioning of the trial attorney by the post-conviction judge at the 3850. But the trial attorney did testify. Ms. LeGrand testified that he told her not to involve his family, quote, unquote. Correct, Your Honor. It was not what my post-conviction. The trial counsel testified. He said, I don't want to present stuff. Do not involve my family. I think it was – I don't have the direct quote in front of me, but it was basically he was hesitant to involve his family or something to that effect. And I know it's at page 1830 and 1831, I believe. But in any event, the fact finder, the state habeas court, said that what the record was not sufficient to support that finding. Right, as to the family aspect of it. But what is unrefuted is that when he pled guilty and then at the penalty phase and then at the Spencer hearing, all three times he said, I don't want any mitigation presented to the jury. And he said that three separate times. And, in fact, they stopped the proceedings and said, hey, we have Dr. Keown's report here. Do you want the judge to look at it? And he said no. He did that on two separate occasions at the penalty phase. What's your perspective about whether this is a legal question or a factual question? That is, this hypothetical. What would have happened had this mitigation evidence been available to him, had been investigated, had been explained to him? The determination of the Florida Supreme Court is that the client would not have allowed it to be presented. So it's a hypothetical because it didn't actually happen. Is that a determination of fact or law or what? How do we review that? I think this court has to review the factual determination, something that would be a factual inference, which in this case is that the defendant waived the presentation of it. That is a fact that's refutable or not refutable. And that is clearly on the record that he did not want to evaluate that is to look at evidence. There's nothing about the law that we look at to evaluate, to review that determination. And for that reason, what you're saying is the determination that he would have said don't present that has to be drawn from inferences in a factual record, which makes it a factual determination. Yes, Your Honor. You said that much better than I could have. But that's exactly it. And I think it was one of the—Your Honor there said that it was an underpinning of the total prejudice prong. And I think that's the case. But in this case—and I don't want to get delved down into the deficient performance because I don't really think counsel did perform deficiently. I think she was investigating this mitigation. She was aware. And I wanted to point out in the chronology that counsel brought up is that Mr. Krawcheck, as early as April of 91, told Dr. Keown that he wanted the death penalty as opposed to a life in prison sentence. So this was not a sudden change. He had been presenting this as a possibility for quite some time, well before he changed his plea. And ultimately in September, when he changed his plea, and then again in February of the following year when they had the actual jury penalty phase. And then after that, they had the Spencer hearing. And in all three of those occasions, Mr. Krawcheck indicated, I'm not going to allow my counsel to present anything on my behalf. And I think this court—I think it's actually a relatively straightforward decision for this court in following its precedent in those cases that I cited. Unless there's any further questions. You know, I just want to talk a little bit more about the Florida Supreme Court opinion. I've read it over and over again. And it didn't seem to me like the opinion weighed in all of the mitigation evidence, specifically the mental health mitigation. Am I right about that? No, the opinion did not discuss that in any detail, no. The post-conviction trial court discussed it in great detail and found that the two defense mental health experts lacked credibility as to their opinions and rejected pretty much all of what they said as far as their opinions were. I think that was well supported by the evidence in this case. I think you look at Dr. Keown's report and then the Army's report. I think they were very consistent in this regard. It doesn't mention the other doctors that had— No, the Florida Supreme Court's opinion doesn't mention much, Your Honor. It's almost like they didn't read the— I mean, I know people criticize my opinions too, but it seems like they didn't read the state habeas court opinion almost. I can't speak for what happened, Your Honor. I can only tell you that it is a relatively brief analysis. They rely on their two previous cases. And I think what it boils down to is just simply when you have a defendant saying, I'm not going to present mitigation unless there's something else there, you can't satisfy the prejudice prong. That's what Shira B. Landrigan tells us. And that's exactly—I mean, they didn't cite that case, but that's exactly what they followed. And the other thing that I thought was interesting was they seemed to characterize it as Mr. Krawchuk telling his lawyer not to investigate, but it looked like to me really when he spoke up, it was at the point of whether the mitigation investigation that had been done would be presented. I think it's a little twofold. I think it's both, Your Honor. He certainly told his counsel not to go forward and involve his family. He also didn't want—obviously he didn't want her to present it, but he was aware of everything that was there. I mean, everything that came out in post-conviction was in Dr. Keown's report, which he had been provided with. He obviously knew about his abusive family. He was aware of everything. He could have had her pursue this if he wanted her to, but he was writing her letters that he would rather have a death sentence than get life in prison. So he was not— Well, but that gets back to performance, which you don't want to— Right, but if this court were to review that de novo, I would think that this court would find that she wasn't deficient in her investigation in this case because, like I said, she got the Army records, she got the psychiatrist to evaluate him, and her general testimony was basically he changed his plea. He waived his motion for mitigation specialist at that time. I can't in good faith go hire another mitigation specialist when he just pled guilty and waived it. So his actions certainly hampered her investigation, but overall she was still aware of everything that's been brought out in post-conviction. Maybe not the details of it, certainly, but in a general sense she was aware of it. It was all in Dr. Keown's report. If we were going to review something de novo, it would seem to me the thing you would want us to review de novo is to assume all the evidence got presented in mitigation. Would it have made a difference? There was pretty horrible aggravation here, and if we looked at that de novo, it's not entirely clear to me that it would have been enough to establish a reasonable probability of a difference. No, I don't really think you have to get to that prong because he hasn't shown that he would have presented it, but if you did, I think your analysis would mirror that of the post-conviction trial court's analysis where that judge went into it in great detail as to what aggravators were presented and what few mitigation facts were presented at the evidentiary hearing, and they were all non-statutory. In fact, at the evidentiary hearing, counsel presented evidence which negated one of the statutory mitigators that the trial judge had found when he originally sentenced Mr. Krawchuk. He found that he had no significant prior history, and after hearing the evidentiary hearing testimony, he said, well, that doesn't apply anymore. What was the prior history? I missed that. It wasn't any resulting convictions. It was testimony that he was a serial burglar or would go around and was breaking into people's houses and stealing stuff. I think it came from his wife or his ex-wife's testimony, and he basically said that other than that, I don't believe he had much other than I think he had an assault, some things back in the military time. He was kicked out of the military and put in confinement in the military for events, but I don't think he hadóhe didn't have a very major record at the time of this crime. If there are no further questions, the respondent would ask that this court affirm the lower court's report. I believe you argued the balance of aggravating, mitigating factors in your brief and said look at it de novo and the result would be the same. Yes, Your Honor. You argued that in your brief. Again, the post-conviction court did a great analysis, very in-depth on that, and I believe that's well supported. By the record. We have some very strong aggravators in this case, including HAC and CCP. Thank you, Your Honor. Mr. Scheer, you'll have your full seven minutes. Thank you. I actually just have a few brief comments or points to make. First, again, there's talk of all these letters and all these letters. There is one letter, September 30th, two weeks after Mr. Krawchuk pleads guilty, where he discusses wanting a death sentence. All of the other communications between Mr. Krawchuk and his counsel were favorable, positive, cooperative. This is a classic case, like Blanco and other cases, where the attorney waited too long to investigate, the client throws in the towel, and, of course, at that point, it's too late. When you look at the colloquy at the penalty phase, what is very clear and what Ms. LeGrand tells Mr. Krawchuk is that he would have to testify at the penalty phase in order to present the doctor's information, and that is simply incorrect. Mr. Krawchuk, as the letters do make clear, did not want to testify in his case at all about anything. And so this is why the colloquy goes back and forth at the penalty phase with regard to what Mr. Krawchuk will let counsel do, what he won't let counsel do. Finally, she says, well, you would have to testify. And he says, well, I don't want anything. And then the judge says, well, do you have anything even to present? And Ms. LeGrand says, I don't have anything to present. This is why the law imposes a burden on counsel in a capital case to investigate at the outset. And what Ms. LeGrand testified to at the hearing is that her practice is to wait, to investigate mitigation until after the guilt phase issues are done. That is simply inconsistent. What do you do with the statement in Lanegren that the investigation is irrelevant because on prejudice we assume counsel should have discovered all this and your burden is to show a reasonable probability you would have allowed. So I don't even understand why investigation matters here. It seems irrelevant and immaterial under Shiro, under Pope, under Cummings. Help me grapple with that because all three of those cases say the duty to investigate doesn't matter because we're going to assume for the first Langergan prong that they would have discovered it and your burden is to show a probability you would have offered it. Okay, so. I think the main, well, there's a number of. When they say it's irrelevant, I don't understand why you keep going back to investigate. Well, I don't know that they say it's irrelevant, but that case focuses on, well, it focuses really on an evidentiary hearing, but certainly focuses on prejudice. And I think what distinguishes Langergan from the cases that you mentioned mainly is that those cases involve Langergan and Pope and Allen, and I forget there's another one, Cummings, all involved unequivocal from the beginning. I do not want mitigation. I do not want you to talk to anybody. I want to die. That is what distinguishes Mr. Krawchuk's case principally. What the Supreme Court also went on to look at in Langergan was the quality of the evidence that was proffered as proving the prejudice prong, and the court classified it as weak. Essentially, it was the same information. I think it was the mother and something about a birth defect. In fact, it was, in my view also, not particularly persuasive when it comes to nothing, nothing approximating the information that was available here to Ms. LeGrand that she did not uncover. I think that the court in Langergan said essentially it was cumulative. Also in Langergan, counsel had repeatedly explained to the client what mitigation was, the purpose of it, how all of the information in his background fit into those mitigating circumstances. All we have here is that letter with a statute attached that doesn't really explain how those mitigators apply to the facts of Mr. Krawchuk's life because Ms. LeGrand didn't know about the true facts of Mr. Krawchuk's life and the extent of it. She certainly didn't know about anything about his mental health. I think there are a number of distinguishing factors in that line of cases that makes Mr. Krawchuk's case different. One thing about Cummings that I wanted to point out is that in Cummings, the court had said, well, I think Your Honor was on Cummings, talked about Mr. Cummings didn't affirmatively testify or anything at the evidentiary hearing. What the court in Cummings said was, in fact, Mr. Cummings affirmatively kept objecting to the evidentiary hearing, to the mitigation presented at the evidentiary hearing, and that furthered this court's analysis in terms of finding a lack of prejudice. Here, of course, we have none of that. Mr. Krawchuk was fully cooperative with collateral counsel as he was with the pretrial competency and sanity expert, as he was with his attorney up until the point when things went south, he pled guilty, he feared having it testified, and he lost hope. All of that is consistent with Mr. Krawchuk's psychological and psychiatric makeup. If you look at Dr. Sultan's testimony in particular, this is a classic abuse survivor. This is how he deals with things. He shuts down. He shuts down, and that's what happened here. All hope was lost, pled guilty, shut down. And I submit that we've established not only prejudice but deficient performance. Thank you very much. Court will be in recess. Thank you.